**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JOY COMPTON,** | ) | |
|     **Plaintiff,** | ) | **No. 11 C 8305** |
| | ) | |
| **v.** | ) | |
| **CAROLYN W. COLVIN,** | ) | **Magistrate Judge Geraldine Soat Brown** |
| **Acting Commissioner of Social** | ) | |
| **Security,** | ) | |
|     **Defendant.** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Joy Compton brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act, 42 U.S.C. § 423 *et seq.* (Compl.) [Dkt 1.][1] Plaintiff has filed a motion for summary judgment [dkt 20] and a supporting memorandum seeking an order reversing the Commissioner's final decision and entering a finding of disability and award of benefits or remanding for further administrative proceedings ("Pl.'s Mem.") [dkt 21]. The Commissioner has filed a brief opposing the motion ("Def.'s Resp.") [dkt 22], and Plaintiff has replied ("Pl.'s Reply") [dkt 26]. The parties have consented to the jurisdiction of the Magistrate Judge pursuant to 28 U.S.C. § 636(c). [Dkt 10.] For the reasons set forth below, Plaintiff's motion is granted and the case is remanded.

---

[1] The regulations regarding DIB and SSI are substantially similar and where they do not significantly differ, only one section will be cited. *See Ashpaugh v. Apfel*, No. 98 C 6561, 2000 WL 1222153 at *1 n. 3 (N.D. Ill. Aug. 22, 2000)

# PROCEDURAL HISTORY

Plaintiff first applied for benefits on June 25, 2009. (R. 85.) Her claim was denied initially on November 10, 2009 and again upon reconsideration on May 6, 2010. (R. 115-19, 122-26.) Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"), and a hearing was held on April 11, 2011. (R. 17-84.) The ALJ issued a decision denying Plaintiff's request for benefits on May 25, 2011. (R. 89-112.) The Appeals Council declined Plaintiff's request for review on October 27, 2011 (R.1-6), thereby making the ALJ's decision the final decision of the Commissioner. *See Villano v. Astrue*, 556 F.3d 558, 561-62 (7th Cir. 2009).

# BACKGROUND

Plaintiff was 49 years old at the time of the hearing before the ALJ. (R. 17, 85.) She lives in an apartment with her two daughters, ages 14 and 24, and her elder daughter's two year-old son. (R. 47.) Plaintiff has a college degree and has completed some graduate work. (R. 46, 211.) Plaintiff had worked as a substitute teacher for over 15 years but was let go in 2008 because she did not have a teaching certificate. (R. 31, 46-47.)

## Medical Evidence

Plaintiff alleges that she became disabled on June 15, 2008, based on both physical and mental impairments. (R. 207.) Physically, she alleges stenosis of the spine,[2] degenerative disc

---

[2] Spinal stenosis is the "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space." *Dorland's Illustrated Medical Dictionary* 1770 (32nd ed., Elsevier Saunders 2012) [hereinafter *Dorland's*]. An intervertebral foramen is "the passage formed by the inferior and superior notches on the pedicles of adjacent vertebrae; it transmits a spinal nerve and vessels." *Id.* at 729.

disease, degenerative joint disease in the knees, edema in the lower legs,[3] and a Baker cyst.[4] (R. 26.) She alleges that these impairments cause her pain in her legs, knees, and back and limit her ability to stand and sit for prolonged periods of time. (R. 26, 40-41, 56.) She also alleges that she is morbidly obese, uses a cane to walk, and suffers from asthma, hypertension, and diabetes. (R. 26.) As for mental impairments, Plaintiff alleges depressive, anxiety, and panic disorders. (*Id.*)

**Physical Impairments**

The earliest medical report in the administrative record is of an MRI of Plaintiff's lumbar spine from February 2007. (R. 528.) The report is marked page one of two, but the second page is not in the record. (*Id.*) The MRI revealed no significant curvature or alignment abnormalities, but it did show mild central spinal canal and right neural foraminal stenosis at the L4/5 level. (*Id.*)

Plaintiff went to the emergency room on September 5, 2008 with chest and leg pain and was admitted as an inpatient. (R. 270.) The doctor diagnosed her with atypical chest pain, right lower extremity pain, asthma, obesity, bradycardia,[5] and noted her history of deep vein thrombosis.[6] (R.

---

[3] Edema is "the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues." *Dorland's* at 593.

[4] A Baker cyst is "a swelling behind the knee, caused by escape of synovial fluid which becomes enclosed in a membranous sac." *Dorland's* at 458.

[5] Bradycardia is the "slowness of the heartbeat, as evidenced by slowing of the pulse rate to less than 60." *Dorland's* at 245.

[6] Deep vein thrombosis presence of blood clots in "of one or more deep veins, usually of the lower limb, characterized by swelling, warmth, and erythema." *Dorland's* at 1923. Erythema is redness of the skin produced by congestion of the capillaries. *Id.* at 643.

271.)  When subjected to a Naughton protocol,[7] Plaintiff was able to ambulate for five minutes but stopped due to fatigue and showed a markedly reduced functional capacity.  (R. 280.)  In response to her chest pain and history of deep vein thrombosis, Plaintiff underwent other procedures to test for the presence of blood clots and embolisms, including a venous Doppler study, a myocardial perfusion scan, and a lung scan.  (*See* R. 283-285.)  These tests did not reveal any abnormalities. (*Id.*)

In 2009, she saw her doctors at various times to treat a sinus infection, a cold, asthma, leg swelling and cramps.  (R. 294-98.)  A March 2009 treatment note indicates that Plaintiff started seeing a physical therapist for her back.  (R. 39, 295.)  After Plaintiff filed for benefits in June 2009, Dr. Fauzia Rana, at the request of the Social Security Administration, examined Plaintiff on September 21, 2009, and diagnosed Plaintiff with degenerative arthritis in the lumbar spine, diabetes mellitus–non-insulin dependent, chronic obstructive and restrictive lung disease, and morbid obesity. (R. 324-27.)  Dr. Rana stated that Plaintiff was "able to sit, speak and hear without limitations," but noted that she had "some difficulty in prolonged standing, walking, lifting and carrying due to weight."  (*Id.*)

In November 2009, Disability Determination Services ("DDS") consulting physician Dr. Julio Pardo reviewed Plaintiff's medical records and in a physical residual functional capacity ("RFC") assessment diagnosed Plaintiff with degenerative arthritis, diabetes, and morbid obesity. (R. 340.)  He opined that Plaintiff could occasionally lift 20 pounds and frequently lift 10 pounds, and found occasional limitations for climbing, balancing, stooping, kneeling, crouching, and

---

[7] A Naughton protocol is "a procedure for assessing cardiovascular health using a graded treadmill exercise test; the selected treadmill speed remains constant through the test but the treadmill slope is raised at the end of each two-minute increment."  *Dorland's* at 1536.

crawling. (R. 341-42.) On April 23, 2010, DDS reviewing physician Dr. Francis Vincent affirmed Dr. Pardo's assessment. (R. 396.)

According to treatment notes, in November 2009, Plaintiff experienced lower back pain, but reported that the pain had improved in April 2010. (R. 401, 403.) An April 2, 2010 treatment note shows that Plaintiff missed several referrals and physical therapy. (R. 403-04.) In July 2010, Plaintiff was found to have bilateral extremity swelling and bilateral pitting edema. (R. 405.) On October 19, 2010, Plaintiff complained of back pain because of a herniated disk and was given ibuprofen. (R. 399.) The treatment note states that Plaintiff had not had been physical therapy for four or five months, but had been doing back exercises at home. (*Id.*)

On December 6, 2010, Plaintiff complained of "sudden" lower back pain from what Plaintiff described as herniated discs. (R. 510.) She was evaluated by and started seeing physical therapist Blanche Toole for back and knee pain. (R. 512.) On December 30, 2010, Plaintiff went to the hospital for left knee pain and swelling that had persisted for four days. She was prescribed Vicodin and ibuprofen and given information about Baker cysts. (R. 477-79.) Her left knee was x-rayed, and she was tested for deep vein thrombosis. (R. 480-82.) Both tests came back normal. (*Id.*)

On January 4, 2011, Ms. Toole completed a physical RFC questionnaire. She opined that Plaintiff's pain would be expected to frequently interfere with Plaintiff's ability to perform simple work. (R. 505-07.) She stated that Plaintiff could only stand for five minutes at a time and sit for 20 to 30 minutes at a time. (R. 506.) She further indicated that Plaintiff must use a cane to walk and needed to elevate her legs to alleviate swelling. (R. 506-07.) According to Ms. Toole, Plaintiff probably would need a job that permitted shifting positions at will from sitting, standing, or walking. (R. 506.) She found that Plaintiff could occasionally lift less than 10 pounds and that Plaintiff would

have problems with reaching. (R. 507.) Ms. Toole was unsure how many days of work Plaintiff was likely to miss in a month. (*Id.*) On January 11, 2011, Plaintiff completed her physical therapy with Ms. Toole and was deemed to have met all goals, including a 50 percent reduction in pain. (R. 521.)

In February 2011, Plaintiff was referred to orthopedist Dr. Daniel Ivankovich for treatment of her Baker cyst. (R. 527.) Dr Ivankovich diagnosed Plaintiff with a lower back pain, right hip osteoarthritis, and right knee pain. (R. 544.) Plaintiff was referred to physical therapy and was prescribed tramadol[8] and a cane. (R. 544-45.) Tests found degenerative changes to Plaintiff's left and right hips but found minimal degenerative changes to her left and right knees. (R. 546-49.)

### Mental Impairments

Upon referral from one of her physicians, Plaintiff saw Dr. Paul Haider, a licensed clinical professional counselor ("LCPC"), on June 23, 2009, for symptoms of depression and anxiety. (R. 307.) He found that she had generalized anxiety disorder and major depressive disorder–recurrent, moderate without psychotic features. (R. 307.) He assigned her a Global Assessment of Functioning ("GAF") score of 52.[9] (R. 308.) On June 25, 2009, Dr. Haider wrote a letter opining that Plaintiff was "unable to work" and was entitled to receive SSI disability benefits. (R. 310.)

In September 2009, at the request of Social Security Administration, Plaintiff had a mental

---

[8] Tramadol is used for the treatment of "moderate to moderately severe pain." *Dorland's* at 1950.

[9] The GAF scale is "a rating of psychiatric status from 1 (lowest level of functioning) to 100 (highest level), assessing psychological, social, and occupational functioning; widely used in studies of treatment effectiveness." *Dorland's* at 1672. "A GAF score of 41–50 indicates serious symptoms; a score of 51–60 indicates moderate symptoms; and a score in the range of 61–70 indicates mild symptoms." *Farrell v. Astrue*, 692 F.3d 767, 769 (7th Cir. 2012) (citing Am. Psych. Assn., Diagnosis & Statistical Manual of Mental Health Disorders 32-34 (4th ed. 2000)).

status examination performed by Dr. Michael Stone, a licensed clinical psychologist. (R. 336-39.) He diagnosed her with depression and anxiety with panic attacks secondary to medical problems. (R. 339.) The mental status examination showed "no significant impairments in her ability to perform calculations and in her general fund of knowledge," but Dr. Stone did note that Plaintiff "exhibited problems maintaining a consistent level of attention and concentration throughout the evaluation." (R. 338-39.) Dr. Stone stated that Plaintiff exhibited "adequate judgment" and had no difficulty comparing and contrasting objects. (R. 339.) He further observed that Plaintiff was "tense, serious and irritable" during the exam, but did not exhibit symptoms "typical of bipolar disorder." (*Id.*)

In November 2009, DDS reviewing psychologist Dr. Phyllis Brister completed a Psychiatric Review Technique ("PRTF") and mental RFC assessment. (R. 348-65.) In the PRTF, Dr. Brister found Plaintiff to have mild restrictions of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (R. 358.) In the RFC, Dr. Brister noted moderate limitations in Plaintiff's ability to carry out detailed instructions, to maintain attention and concentration for extended periods, and to work in coordination or proximity to others without becoming distracted. (R. 362.) Dr. Brister concluded that Plaintiff was capable of simple substantial gainful activity. (R. 364.)

Plaintiff continued to see Dr. Haider. In her October 2009 appointment, Plaintiff reported feeling "indifferent and lethargic at times, but [stated that she] does her best to be socially interactive." (R. 433.) In December 2009, she reported "severe levels of psychological stressors" including an eviction and problems with her elder daughter and her daughter's boyfriend. (R. 371.) In January 2010, Plaintiff reported an alleviation of symptoms from depression and anxiety, but also

stated that she had "a moment of rage" and threw a knife at her daughter's boyfriend. (R. 373.) In April 2010, taking into account Dr. Haider's notes, DDS reviewing psychologist Dr. Kirk Boyenga affirmed Dr. Brister's initial determination, but did note that Plaintiff is limited by depression, anxiety, and panic attacks. (R. 396.)

Plaintiff saw Dr. Haider's colleague, licensed clinical social worker Jenel Owens, in September 2010. Plaintiff described having problems with a supervisor at a law office where she was training to become an administrative assistant. (R. 427.) Plaintiff stated that she had anxiety and depression but that she had an active social and church life. (*Id.*) Ms. Owens assigned Plaintiff a GAF score of 68. (R. 427.) In March 2011, Ms. Owens completed a mental RFC questionnaire. (R. 522-24.) Ms. Owens admitted that her contact with Plaintiff had been infrequent but stated that the diagnostic impression was "consistent and persistent." (R. 522.) Ms. Owens found that Plaintiff would have to miss more than three days of work a month and assigned Plaintiff a GAF score of 52. (R. 522-23.) She also indicated that Plaintiff's highest GAF in the past year was 50. (R. 522.) She opined that Plaintiff had marked restrictions in activities of daily living, marked difficulties in maintaining social functioning, frequent deficiencies of concentration, persistence, or pace, and repeated episodes of deterioration or decompensation in work or work-like settings. (R. 524.)


**HEARING**

**Plaintiff's Testimony**

At the hearing on April 11, 2011, Plaintiff testified extensively about her physical limitations. When asked by the ALJ to describe the physical reasons that she is unable to work, Plaintiff stated that her back is the main problem. (R. 34.) Plaintiff recounted an episode that occurred a few

months before the hearing where her back went out and "it pushed the pelvis forward." (*Id.*) She was prescribed tramadol for the pain. (*Id.*) Upon questioning by her attorney, she described an October 2010 incident where her back went out while bending down to reach a file cabinet while working at a daycare center. (R. 43-44.) She had been working at the daycare center in order to obtain welfare benefits, and did not return to the daycare job after the incident. (R. 43-45.)

Plaintiff described how her knee started to bother her in physical therapy. (R. 35.) She related that she uses a cane to walk and cannot walk more than two blocks due to the pain in her back and her knees. (*Id.*) Plaintiff stated that she has been using a cane for four or five months, and it was prescribed to her one month before the hearing. (R. 56-57.) She testified that she cannot stand for more than five minutes at a time, and at the hearing, she asked to stand up after about 30 minutes of sitting. (R. 41.) She said that she stands to sing in the choir at church, but neither stands to pray nor kneels to take communion. (R. 40-41.) She asserted that driving for 10 minutes causes her pain in her right leg and that she did not feel comfortable driving as she has run stop signs and red lights because her "concentration is off." (R. 32.) Plaintiff explained that she is unable to do her daily chores because she had been instructed not to bend by her physical therapist. (R. 36.) She stated that she cannot lift more than five or six pounds and that she is unable to lift her two year-old grandson. (R. 42.) As for medication, Plaintiff testified that she takes metformin,[10] lovastatin,[11] enalapril,[12]

---

[10] Metformin is a diabetes medication. *Dorland's* at 1146.

[11] Lovastatin is used to lower cholesterol. *Dorland's* at 1075.

[12] Enalapril is used to treat hypertension. *Dorland's* at 611.

amitriptyline,[13] Singulair,[14] Advair,[15] hydrochlorothiazide,[16] tramadol, and citalopram.[17] (R. 37-40.) When questioned by the ALJ as to the reason for her amitriptyline prescription, Plaintiff explained that she has neuropathy in her left foot. (R. 39.)[18]

Plaintiff also testified about her mental impairments. When she was told (in 2008) that her services as a classroom teacher were no longer needed, it "was a crush" and "things started tumbling down" on her. (R. 31.) Plaintiff testified that in an attempt to get her teaching certificate, she completed one year of graduate school. (R. 45-46.) Plaintiff received help from tutors and classmates in order to get through the program. (R. 46.) She did not end up getting her certificate as there were more hours to complete, and Plaintiff did not think it was worth completing as she would not be receiving a Master's degree for completing the hours. (*Id.*)

Plaintiff recalled that when she was threatened with eviction in March 2010 and had to move apartments, she received "horrible, totally horrible" treatment from her mother, her elder daughter, and her daughter's boyfriend. (R. 31, 48, 392.) She stated that she has not been able to depend on her children for help (R. 47) and that she occasionally, but not often, looks after her grandson. (R.

---

[13] Amitriptyline is an antidepressant and is also used in the treatment of chronic pain. *Dorland's* at 63.

[14] Singulair is used to treat asthma. *See Dorland's* at 1179, 1719.

[15] Advair is used to treat asthma, allergic rhinitis, and other inflammatory nasal conditions. *See Dorland's* at 34, 722.

[16] Hydrochlorothiazide is used to treat hypertension and edema. *Dorland's* at 878.

[17] Citalopram is an antidepressant. *Dorland's* at 366.

[18] Neuropathy is "a functional disturbance or pathological change in the peripheral nervous system, sometimes limited to noninflammatory lesions." *Dorland's* at 1268.

42.)  Plaintiff explained that her weight had dropped from 370 pounds to 320 pounds due to stress.  (R. 34.)  She indicated that she goes to church, but has lost interest in her prior hobbies of reading and writing (R. 42).

**Medical Expert's Testimony**

The ALJ called Dr. Hugh Savage to testify as a reviewing medical expert.  Dr. Savage stated that Plaintiff's physical impairments were asthma, hypertension, chronic pain syndrome–lower back with leg radiation, history of herniated discs, morbid obesity, diabetes-mellitus, and major depression of a moderate degree.  (R. 50.)  He acknowledged that there was a history of leg swelling and clots, but he did not see any "actual demonstration of clots" and noted that the tests for deep vein thrombosis were negative.  (R. 50-52.)  When questioned by the ALJ about Plaintiff's claims of herniated discs that she reported to her treating doctors, Dr. Savage testified that the February 2007 MRI showed a posterior disc bulging which is the "earliest progression toward" a herniated disc.  (R. 52-53.)  According to Dr. Savage, the MRI showed clinically insignificant central spinal stenosis and right neuroforaminal stenosis, and Plaintiff's September 2009 exam showed a "slight narrowing of the disc space between" the L1 and L2 vertebrae.  (*Id.*)  After characterizing the results of the 2009 consultative exam as not "describ[ing] weakness," Dr. Savage concluded that the absence of weakness meant that there was no significant spinal stenosis.  (R. 54.)

Dr. Savage stated that there were no suggestions of surgery by her doctors for Plaintiff's back or Baker cyst.  (R. 57-58.)  Dr. Savage testified that the bilateral pitting edema is due to Plaintiff's obesity and not heart failure.  (R. 58-59.)  He explained that the current treatment for that type of edema is compression of the lower extremities with an elastic hose called a thigh TED hose, rather

than leg elevation, and noted that elevation "destroys" functional capability. (R. 59.) He additionally found that her asthma was well controlled. (R. 60.) When questioned by the ALJ about Plaintiff's prescription for amitriptyline, he explained that Plaintiff's prescription could be used to treat depression and that he suspected that the prescribing doctor felt that it would help both Plaintiff's neuropathy and depression. (R. 60-61.) He added that he did not think that the neuropathy was significant because the doctor did not perform "the tests normally prescribed to get to the bottom of neuropathy." (R. 61.)

Dr. Savage opined that Plaintiff's impairments did not meet any of the disability listings. (R. 59-60.) In his opinion, Plaintiff's RFC was light work with the ability to lift 20 pounds occasionally and 10 pounds frequently. (R. 61.) He testified that Plaintiff could stand and sit for six hours in an eight hour workday, but ruled out using ladders, ropes, and scaffolds and limited her to occasional exposure to heavy or hazardous machinery. (*Id*.) As for postural limitations, Dr. Savage concluded that Plaintiff should not crawl, but could occasionally bend and stoop and could probably kneel. (R. 61-62.) He did not think the physical therapist's limitations on Plaintiff's reaching were justified by the medical record. (R. 66.) Prompted by the ALJ, Dr. Savage opined that it would be reasonable to expect Plaintiff to need a sit/stand option. (R. 75-76.) He opined that Plaintiff should not work in a "fast paced assembly line" or be exposed to extreme temperatures or humidity. (R. 63.)

On cross-examination, Dr. Savage concluded that Plaintiff's testimony regarding her most recent injury from bending was a muscoskeletal strain and a disc bulge and was not indicative of a sudden herniation of her discs "to a degree that [had not] been seen before." (R. 72.) He indicated that he would not expect pain from Plaintiff's disc bulging or "mild stenosis." (R. 71.) Dr. Savage acknowledged that Plaintiff has hip and knee osteoarthritis, but stated that Plaintiff has a "very

minimal" decrease in flexion in her knee.  (R. 74-75.)

**Vocational Expert's Testimony**

The ALJ called as a witness Vocational Expert ("VE") Dr. Richard Hamersma. (R. 77-83.) As described further in this opinion, the VE testified that Plaintiff could perform the jobs of telephone solicitor (for which there are 4,000 jobs available) and sedentary inspector (1000 jobs available).  (R. 82.)

**DISABILITY DETERMINATION PROCESS**

Under the Social Security Act, disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423 (d)(1)(A).  The regulations prescribe a five-part sequential test for determining whether a claimant is disabled.  *See* 20 C.F.R. § 404.1520. Under the regulations, the Commissioner must consider: (1) whether the claimant has performed any substantial gainful activity during the period for which she claims disability; (2) if she has not performed any substantial gainful activity, whether the claimant has a severe impairment or combination of impairments; (3) if the claimant has a severe impairment, whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe and of such duration as to preclude substantial gainful activity; (4) if the impairment does not meet or equal a listed impairment, whether the claimant retains the residual functional capacity to perform her past relevant work; and (5) if the claimant cannot perform her past relevant work, whether she is unable

to perform any other work existing in significant numbers in the national economy. *Id.*; *Zurawski v. Halter*, 245 F.3d 881, 885 (7th Cir. 2001). An affirmative answer at steps one, two or four leads to the next step. *Zurawski*, 245 F.3d at 886. An affirmative answer at steps three or five requires a finding of disability, whereas a negative answer at any step other than step three precludes a finding of disability. *Id*. The claimant bears the burden of proof at steps one to four, and if that burden is met, the burden at step five shifts to the Commissioner to establish that the claimant is capable of performing work existing in significant numbers in the national economy. 20 C.F.R. § 404.1560(c)(2); *Zurawski*, 245 F.3d at 886.

## THE ALJ'S DECISION

At step one, the ALJ concluded that Plaintiff had not engaged in substantial gainful activity since June 15, 2008, Plaintiff's alleged disability onset date. (R. 94.) At step two, the ALJ found that Plaintiff had the severe physical impairments of "morbid obesity," "lower back pain–mild degenerative changes of lumbar spine . . . and mild central canal right neuroforaminal stenosis L4-L5," and "bilateral pitting edema." (*Id.*) The ALJ additionally found the severe mental impairments of anxiety with panic attacks and major depressive disorder, recurrent, moderate. (*Id.*) The ALJ stated that she based her findings on Plaintiff's medical records and the records of the consultative examiners (*id.*), and her opinion summarized the evidence in the record and Dr. Savage's testimony (R. 95-101.) At step three, the ALJ concluded that the Plaintiff's impairments did not meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 101.) The ALJ found the Plaintiff's stenosis to be mild and her asthma to be well controlled. (*Id.*) For her mental impairments, the ALJ concluded that Plaintiff had mild restrictions in performing the

activities of daily living, moderate restrictions with regards to social functioning, and moderate restrictions in maintaining concentration, persistence, and pace. (R. 101-02.)

The ALJ assessed Plaintiff's RFC as that of performing light work with the ability carry 20 pounds occasionally and 10 pounds frequently. (R. 103.) She concluded that during an eight hour workday, Plaintiff would be able to stand and walk six hours and sit six hours with an at will stand/sit option and found that Plaintiff may need to use a cane for walking. (*Id*.) The RFC allowed for the occasional climbing of stairs, stooping, kneeling, and crouching, but not any crawling and climbing of ladders, ropes, or scaffolds. (*Id*.) The ALJ found that Plaintiff was "capable of performing simple routine repetitive tasks that do not require strict production quotas" and limited Plaintiff to "occasional interaction with the general public and coworkers." (*Id*.)

In reaching her conclusion, the ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not credible to the extent they are inconsistent with the [RFC] assessment." (R. 104.) In particular, the ALJ stated that Plaintiff was "not a reliable historian regarding her medical history," "exaggerate[d] the extent of pain in her back," and was not "fully credible regarding her psychiatric symptoms." (R. 104-05.) The ALJ gave "great weight" to the opinion of Dr. Savage and "substantial weight" to the DDS mental and physical assessments. (R. 105.) The ALJ gave "very little weight" to the opinion of Plaintiff's social worker, Ms. Owens, and gave limited weight to the opinion of Plaintiff's physical therapist, Ms. Toole. (R. 105-06.)

At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (R. 106.) At step five, the ALJ found there were jobs in the economy that Plaintiff could perform,

specifically 4,000 telephone solicitor jobs and 1,000 inspection jobs.  (R. 107.)  Thus, based on that

analysis, the ALJ found that Plaintiff was not disabled as defined by the Social Security Act.  (*Id.*)


## STANDARD OF REVIEW

The Social Security Act provides for limited judicial review of a final decision of the

Commissioner.  *See* 42 U.S.C. § 405(g).  Where the Appeals Council declines a requested review

of the ALJ's decision, it constitutes the Commissioner's final decision.  *Villano*, 556 F.3d at 561-62.

While the ALJ's legal conclusions are reviewed *de novo*, her factual determinations are reviewed

deferentially and are affirmed if they are supported by substantial evidence in the record.  *Jones v.*

*Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010); *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

Evidence is substantial if it is sufficient for a reasonable person to accept it as adequate to support

the decision.  *Jones*, 623 F.3d at 1160; *Craft*, 539 F.3d at 673.  "Although this standard is generous,

it is not entirely uncritical," and the case must be remanded if the decision lacks evidentiary support.

*Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

When evaluating a disability claim, the ALJ must consider all relevant evidence and may not

select and discuss only the evidence that favors her ultimate conclusion.  *See Murphy v. Astrue*, 496

F.3d 630, 634-635 (7th Cir. 2007); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).  Although

the ALJ is not required to discuss every piece of evidence, the ALJ must provide an accurate and

logical bridge between the evidence and the conclusion, so that a reviewing court may assess the

validity of the agency's ultimate findings, and afford the claimant meaningful judicial review.  *Craft*,

539 F.3d at 673.  "If the Commissioner's decision lacks adequate discussion of the issues, it will be

remanded."  *Villano*, 556 F.3d at 562.

**DISCUSSION**

Plaintiff contends that the ALJ erred by not discussing the weight given to Dr. Haider's opinion and by improperly discounting the opinions of Ms. Owens and Ms. Toole. (Pl.'s Mem. at 7-13.) She further argues that the ALJ did not properly evaluate Plaintiff's credibility and that the ALJ's step 5 conclusion was not supported by substantial evidence. (Pl.'s Mem. at 13-19.) The Commissioner asserts that the ALJ properly evaluated the opinion evidence and Plaintiff's credibility, and contends that the ALJ's step 5 conclusion was supported by substantial evidence. (Def.'s Resp.)

## I. Opinion Evidence of Dr. Paul Haider, Jenel Owens, and Blanche Toole

Plaintiff argues that the ALJ committed error by not discussing the weight given to the opinion of Dr. Haider, and by discounting the weight given to the opinions of Ms. Owens and Ms. Toole. (Pl.'s Mem. at 7-13.) The Commissioner argues that the ALJ properly discounted these opinions and that the ALJ's RFC findings were supported by substantial evidence. (Def.'s Resp. at 5-8.)

The regulations separate opinion evidence into two categories: "acceptable medical sources" and "other sources." SSR 06-03p, 2006 WL 2329939 at *1-2. Acceptable medical sources are limited to licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech language pathologists. 20 C.F.R. § 404.1513(a). "Other sources" include non-acceptable medical sources, such as nurse practitioners, social workers, and therapists, as well as non-medical sources, such as educational personnel and relatives. 20 C.F.R. § 404.1513(d); SSR 06-03p, 2006 WL 2329939 at *2. According to SSR 06-03p, there are three

"necessary" reasons for the distinction between "acceptable medical sources" and "other sources." *Id.* Only "acceptable medical sources" can "establish the existence of a medically determinable impairment," "give . . . medical opinions," and "be considered treating sources . . . whose medical opinions may be entitled to controlling weight." *Id.*

Acceptable medical sources are further divided into treating and non-treating sources. *See* 20 C.F.R. § 404.1527. If a treating source's opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record, the ALJ is obliged to give it "controlling weight." *Id.* § 404.1527(c)(2). If a treating source's opinion is not given controlling weight, the ALJ must state what weight it is given and analyze the opinion according to the factors listed in 20 C.F.R. § 404.1527(c)(2).[19] These factors include "'the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion.'" *Campbell v. Astrue*, 627 F.3d 299, 308 (7th Cir. 2010) (quoting *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010)). The same factors that apply to evaluating treating sources should be used to evaluate "other sources." *See* SSR 06-03p, 2006 WL 2329939 at *2-3; *Phillips v. Astrue*, 413 F. Appx. 878, 884 (7th Cir. 2010) ("In deciding how much weight to give to opinions from these 'other medical sources,' an ALJ should apply the same criteria listed in § 404.1527([c])(2).").

---

[19] Until March 26, 2012, these factors were listed in 20 C.F.R. § 404.1527(d)(2). *See* 77 Fed. Reg. 10651-01, 10656 (Feb. 23, 2012).

## A. Opinion of Dr. Paul Haider

Plaintiff argues that the ALJ erred by not discussing what weight was assigned to the opinion of Dr. Paul Haider, whom Plaintiff characterized as a treating source. (Pl.'s Mem. at 7-8.) In his one page letter of June 25, 2009, Dr. Haider stated that he is a "licensed clinical professional counselor (LCPC) with a doctorate in clinical psychology" and that he had been Plaintiff's therapist since June 23, 2009. (R. 310.) The letter opined in relevant part:

> Based on Joy's psychiatric diagnoses of Major Depressive Disorder, Moderate (Recurrent without Psychotic Features), Generalized Anxiety Disorder, and Pain Disorder Associated with Both Psychological Factors and General Medical Conditions (chronic), it is my clinical judgment that Joy is unable to work, even in a limited capacity; she is entitled to receive full SSI disability benefits now. Joy has also been diagnosed with severe psychosocial stressors that consist of occupational problems (unemployment) and economic problems (inadequate finances).

> Mrs. Compton is currently at a very low level of functioning which has been exacerbated by severe chronic pain in her body. Joy's current medical conditions consist of asthma, diabetes, low blood pressure, and high cholesterol . . . . Joy also has severe symptoms and impairment in social and occupational functioning. It is clear, in my clinical judgment, that Joy meets the criteria to receive full SSI disability benefits as soon as possible . . . ."

(*Id*.)

The ALJ's opinion described Dr. Haider's letter in its list of exhibits (R. 95), and, notably, mentioned Dr. Haider's treatment notes (R. 98, 104-05), but the ALJ never discussed what weight was given to Dr. Haider's opinion.

The Commissioner argues that Dr. Haider was not a treating source that because Dr. Haider had only examined Plaintiff two days before writing his opinion. (Def.'s Resp. at 8.) The Commissioner argues further that Dr. Haider's conclusion about Plaintiff's eligibility for benefits was not due "controlling weight" as that determination is reserved for the Commissioner. (*Id*. at 8-9.) Plaintiff replies that even if Dr. Haider was a non-treating source, the ALJ was still obligated to

19

explain the weight given to Dr. Haider's opinion. (Pl.'s Reply at 1-2.)

While the parties disagree as to whether Dr. Haider is a treating source, both parties overlook the fact that as an LCPC, Dr. Haider is not considered an "acceptable medical source" under the regulations. *See Welch v. Astrue*, No. 11 CV 384, 2012 WL 3113148 at *9 (D. Me. July 11, 2012) ("[A] licensed clinical professional counselor is not an 'acceptable medical source' for purposes of establishing the existence of an impairment); *Pierson v. Astrue*, No. CV 10-66-M-DWM-JCL, 2011 WL 1468364 at *4 & n.1 (D. Mont. Mar. 16, 2011); *cf. Hawkins v. St. Clair County*, No. 07–142–DRH, 2009 WL 839272 at *4-5 (S.D. Ill. Mar. 30, 2009) (stating that LCPC is not qualified to make medical diagnoses). Because Dr. Haider is not an "acceptable medical source," he cannot be considered a treating source. SSR 06-03p, 2006 WL 2329939 at *2. The proper frame for analysis is as follows: (1) did the ALJ commit error by not explaining the weight given to Dr. Haider opinion as an "other source," and (2) if so, was that error harmless?

As for the first question, the regulations provide that the ALJ "generally should explain the weight given to opinions from these 'other sources.'" SSR 06-03p , 2006 WL 2329939 at *6. "[T]he opinions of other medical sources are important and should be considered when evaluating 'key issues such as impairment severity and functional effects' . . . ." *Phillips*, 413 F. Appx. at 884 (quoting SSR 06-03p, 2006 WL 2329939 at *6).

If this were the only problem with the ALJ's opinion, the court would conclude that it was harmless. An error is harmless when it is "predictable with great confidence that the agency will reinstate its decision on remand." *Spiva v. Astrue,* 628 F.3d 346, 353 (7th Cir. 2010). This analysis is prospective and "not an exercise in rationalizing the ALJ's decision." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Here, the ALJ did not disregard Dr. Haider's treatment notes, just his

opinion drawn after the initial examination. There are sufficient reasons to believe that, had the ALJ discussed the weight assigned to Dr. Haider's June 25, 2009 letter, the result would not be different. First, Dr. Haider's opinion does not contain any test results or an RFC assessment that could be compared and contrasted with the findings of psychologists Dr. Stone, Dr. Brister, or Dr. Boyenga.[20] *See Mellott v. Comm'r of Soc. Sec.*, No. 3:11-CV-92, 2012 WL 645915 at *4 (N.D. Ind. Feb. 28, 2012) (finding harmless error where ALJ did not consider an opinion that concluded that claimant was disabled but contained no RFC opinion or disabling limitations)*; cf. McFadden v. Astrue*, 465 F. Appx. 557, 560 (7th Cir. 2012) (finding harmless error where *inter alia* treating physician's opinion was not based on objective medical findings). Second, Dr. Haider's opinion was written after one examination; thus, there is no reason to believe that Dr. Haider had any special insight as to Plaintiff's condition as compared to Dr. Stone. *Cf.* SSR 06-03p, 2006 WL 2329939 at *5 ("[I]t may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion.") Further, it is unlikely that an ALJ would defer to Dr. Haider's conclusion that Plaintiff was entitled to benefits because that issue is reserved for the Commissioner and Dr. Haider's conclusion is entitled to no "special significance." *See* 20 C.F.R. § 404.1527(d); *Mellott*, 2012 WL 645915 at *4. Lastly, considering that Dr. Haider had seen Plaintiff only once at the time he wrote the opinion, it is doubtful that a reasonable ALJ would find that his one-page conclusory letter trumps the opinions of the two DDS reviewing psychologists. *See* 20 C.F.R. § 404.1527(e)(2)(i) ("State agency medical

---

[20] Although not indicated in the record, Dr. Brister and Dr. Boyenga are licensed clinical psychologists. *See* Ill. Dep't of Financial & Professional Regulation, IDFPR License Lookup, https://www.idfpr.com/LicenseLookUp/LicenseLookup.asp (last visited Oct. 18, 2012).

and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation.") Thus, since it can be said with "great confidence" that the ALJ's decision would not be different, any error committed with respect to not specifying the weight given to Dr. Haider's opinion would be harmless.

### B. Opinion of Jenel Owens

Plaintiff objects to the ALJ's treatment of licensed clinical social worker Jenel Owens's mental RFC assessment. (Pl.'s Mem. at 9-11.)[21] The ALJ gave Ms. Owens's opinion "very little weight" because Ms. Owens indicated that Plaintiff's highest GAF score in the past year was 50 even though six months earlier, Ms. Owens had found Plaintiff's GAF score to be 68. (R. 105.) The ALJ stated that Ms. Owens's opinion was inconsistent with the treatment notes of Dr. Haider and of Ms. Owens. (R. 105.) Further, the ALJ noted that Ms. Owens admitted to "only infrequent contact" with Plaintiff, and found the DDS assessment to be more consistent with the longitudinal record and the treatment exam performed by Dr. Stone. (*Id.*)

Plaintiff first objects to the ALJ's reliance on the GAF score discrepancy and cites *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011), for the proposition that one high GAF score is not sufficient to discredit an opinion finding disability. (Pl.'s Mem. at 10.) In *Punzio*, the court found that the ALJ had improperly discounted a treating psychiatrist's opinion by "cherry-picking" one high GAF score from her treatment notes instead of considering the totality of the treatment notes. *See Punzio*, 630 F.3d at 710. However, that is not what the ALJ did here. Ms. Owens's factual

---

[21] The parties do not dispute that as a social worker, Ms. Owens is not an acceptable medical source under the regulations.

misstatement about her own examination records calls into question the accuracy of her record review and undermines the credibility of her opinion. *See Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (stating that if opinion is "internally inconsistent," ALJ may discount it). It was acceptable for the ALJ to discount Ms. Owens's opinion on that basis. Citing *Shauger v. Astrue*, 675 F.3d 690, 698 (7th Cir. 2012), Plaintiff also asserts that the ALJ should have contacted Ms. Owens because the ALJ had a duty to resolve conflicts in the record. (Pl.'s Reply at 3-4.) This argument is not persuasive. First, in *Shauger*, the conflict did not involve a factual error in an opinion, but instead, was a conflict between a claimant's complaints of severe headaches and a doctor's medically baseless opinion that the complaints were exaggerated. *Shauger*, 675 F.3d at 698. Further, for the proposition that an ALJ has the duty to resolve conflicts in the record, the *Shauger* court cited *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). In *Hacker,* the court stated: "The regulations do not require an ALJ to recontact a treating physician whose opinion was inherently contradictory or unreliable. This is especially true when the ALJ is able to determine from the record whether the applicant is disabled." *Id.* at 938. Thus, here, as in *Hacker*, the ALJ was under no duty to contact Ms. Owens about her contradictory opinion.

Plaintiff, citing *Campbell*, 627 F.3d at 306, argues that the ALJ improperly ignored portions of Ms. Owens's report that suggested that Plaintiff was disabled. (Pl.'s Reply at 3.) Specifically, Plaintiff objects to the discounting of Ms. Owens's opinion on the basis that Ms. Owens had infrequent contact with Plaintiff. According to Plaintiff, the ALJ should have taken into account that Plaintiff had been treated at same clinic for two years and credited Ms. Owens's statement that the diagnostic impression over time was consistent and persistent. (*Id.*) But unlike *Campbell,* these facts are not medical findings that suggest that Plaintiff had a disability. *See Campbell*, 627 F.3d at

306-07. Instead, these are factors that an ALJ might consider when evaluating how much weight to give an opinion. Especially since Ms. Owens's opinion conflicts with the opinions of the DDS reviewing psychologists, the amount of contact Ms. Owens had with Plaintiff was a valid consideration in determining the weight given to her opinion. *See* 20 C.F.R. § 404.1527(c)(2)(i). Plaintiff's objection amounts to nothing more than an unacceptable invitation to this court to reweigh evidence. *See Cunningham v. Barnhart*, 440 F.3d 862, 865 (7th Cir. 2006). Plaintiff also argues that the ALJ was under an obligation to contact Ms. Owens about the discrepancy before discounting her opinion. (Pl.'s Mem. at 11.) This duty, however, only applies to treating medical sources, and only when there is not enough evidence in the record to determine whether the Plaintiff has a disability. *See Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Since neither of those requirements was present here, the ALJ did not abuse her discretion in not contacting Ms. Owens. Plaintiff argues further that Ms. Owens's opinion was "not inconsistent" with the examination performed by Dr. Stone and picks out parts of Dr. Stone's assessment that purportedly support Ms. Owens's findings. (Pl.'s Mem. at 11.) The ALJ, however, stated only that the DDS evaluations were more consistent with Dr. Stone's assessment (R. 105), and Plaintiff does not attempt to show how Ms. Owens's assessment was more consistent than the DDS assessments.

Plaintiff further objects to the ALJ's statement that Ms. Owens "extremely limiting assessment of work abilities and overall function" was inconsistent with the treatment notes of Dr. Haider and Ms. Owens. (Pl.'s Mem. at 10; R. 105.) Plaintiff chides the ALJ for not pointing out the specific inconsistencies. (*Id*.) Overall, although the ALJ could have pointed to specific inconsistencies between Ms. Owens's opinion and the treatment notes, the ALJ sufficiently articulated her reasons for the weight given to Ms. Owens's opinion. *See Cunningham*, 440 F.3d at

865 ("We have no trouble concluding the Commissioner's position was substantially justified, even though the ALJ was not as thorough in his analysis as he could have been.").

### C.  Opinion of Blanche Toole

Plaintiff objects to the ALJ's treatment of the opinion of Blanche Toole, Plaintiff's physical therapist.  The ALJ first pointed out that as a physical therapist, Ms. Toole was "not an acceptable source for diagnosis of physical impairments."  (R. 105-06.)  The ALJ noted that Ms. Toole relied on either a CT scan that was not in the record or an MRI of which only one page of two was in evidence.  (R. 106.)  If Ms. Toole relied on the MRI, the ALJ gave more weight to Dr. Savage's interpretation of the MRI than Ms. Toole's interpretation.  (R. 106.)  The ALJ stated that she gave some weight to Ms. Toole's opinion regarding Plaintiff's ability to shift positions but gave more weight to the opinions of Dr. Savage and the DDS physicians regarding manipulation and lifting limitations and the necessity of leg elevation.  (*Id.*)

Plaintiff argues that the ALJ should not have deferred to the opinions of Dr. Savage and the state agency physicians regarding Plaintiff's physical limitations and the proper treatment for Plaintiff's leg swelling.  (Pl.'s Mem. at 12-13.)  The ALJ correctly stated that as a physical therapist, Ms. Toole was not an acceptable source for medical diagnoses, and the regulations provide that "[t]he fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source.'"  SSR 06-03p, 2006 WL 2329939 at *5.  Thus, it was proper for the ALJ to give more weight to the three acceptable medical sources than to Ms. Toole.

To contest Dr. Savage's opinion that Plaintiff should use a thigh TED hose for her edema,

Plaintiff cites a website to show that leg elevation is an acceptable treatment for leg swelling. (Pl.'s Mem. at 13.) Plaintiff did not, however, challenge Dr. Savage's testimony regarding the thigh TED hose with evidence at the hearing. A single citation to a website is not sufficient to call into question the ALJ's reliance on Dr. Savage's expertise. Lastly, the ALJ's concern about Ms. Toole's reliance on a missing CT scan or an incomplete MRI is valid as the amount of support for an opinion, "particularly medical signs and laboratory findings," is relevant to the evaluation of opinion evidence. 20 C.F.R. § 404.1527(c)(3).

Plaintiff, citing *Phillips,* 413 F. Appx. at 884, complains that the ALJ did not go through explicitly each of the 29 C.F.R. § 404.1527(c) factors with regards to Ms. Toole's opinion and ignored Ms. Toole's treatment relationship with Plaintiff. (Pl.'s Reply at 5.) Plaintiff's reading of *Phillips,* however*,* is contrary to the Social Security ruling cited by the *Phillips* court: "Not every factor for weighing opinion evidence will apply in every case." SSR 06-03p, 2006 WL 2329939 at *5; *see also Sullivan v. Astrue*, 825 F. Supp. 2d 928, 940 (N.D. Ill. 2011) (finding that with regards to the weight given to a therapist's opinion, it was "not required" for ALJ "to have systematically detailed her findings as to each one of the given factors"). Further, at the hearing, the ALJ asked Dr. Savage specifically about the Ms. Toole's conclusions, and he testified that he "did not see anything in the record about shoulder or neck issues" that would justify the limitations Ms. Toole suggested. (R. 66.) Dr. Savage suggested that Ms. Toole's goals for physical therapy could have led Ms. Toole to impose more limitations than were necessary. (*See* R. 65-66.) Accordingly, the ALJ articulated sufficient reasons for the weight given to Ms. Toole's opinion.

## II. Plaintiff's Credibility

Plaintiff objects to the ALJ's criticisms of Plaintiff's credibility. (Pl.'s Mem. at 13-17; Pl.'s Reply at 5-7.) The Social Security Administration provides guidelines as to how the ALJ should determine credibility:

> The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

SSR 96-7p, 1996 WL 374186 at *2. In determining a claimant's credibility, the ALJ must consider all of the evidence in the record and justify the findings with specific reasons. *Craft,* 539 F.3d at 678. In evaluating the claimant's complaints of pain or other symptoms, the ALJ must consider any objective medical evidence, the claimant's daily activities, level of pain or symptoms, precipitating and aggravating factors, medication, treatment or other measures used to alleviate pain and any other factors concerning limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c). As with other determinations, an ALJ need not discuss every piece of evidence, but he must build an accurate and logical bridge from the evidence to the conclusions. *See, e.g., Villano*, 556 F.3d at 562; *Craft*, 539 F.3d at 673.

Because the ALJ is in the best position to determine a claimant's credibility, *Simila v. Astrue*, 573 F.3d 503, 517 (7th Cir. 2009), the ALJ's credibility finding is reviewed with "special deference." *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010). The ALJ's decision need not be perfect and is only overturned if it is "patently wrong." *Id.; see also Halsell v. Astrue*, 357 F. Appx. 717, 722-23 (7th Cir. 2009) ("Not all of the ALJ's reasons must be valid as long as enough of them are . . . ."). "It is only when the ALJ's determination lacks any explanation or support that we will declare it to

be 'patently wrong.'" *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (quoting *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).The Commissioner here argues that Plaintiff has failed to show that the ALJ's decision was patently wrong. (Def.'s Resp. 9-13.)

Plaintiff has some meritorious objections to aspects of the ALJ's credibility finding. Plaintiff first objects to a boilerplate statement in the ALJ's opinion:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.

(R. 104.) Plaintiff correctly points out that the Seventh Circuit has criticized the use of this language. *See Shaugher*, 675 F.3d at 696; *Bjornson v. Astrue*, 671 F.3d 640, 644-45 (7th Cir. 2012). While the use of this boilerplate alone is not enough to warrant reversal, *see Richison v. Astrue,* 462 F. Appx. 622, 625-26 (7th Cir. 2012), it provides no support for the ALJ's credibility finding.

In addition to the boilerplate, there are other aspects of the ALJ's credibility determination that are suspect. The ALJ claimed that Plaintiff was not "a reliable historian regarding her medical history." (R. 104.) For this proposition, the ALJ highlighted the fact that the Plaintiff told doctors that she had deep vein thrombosis, but subsequently tested negative for that condition. (*Id.*) There was no evidence, however, that Plaintiff told her doctors that she *currently* had DVT, and her examination notes indicate that she said that she had DVT as a child. (R. 269.) The fact that a current test turned up negative was not a reason to doubt her credibility about whether she had DVT as a child. Further, the ALJ pointed to one instance where Plaintiff complained of "leg swelling and clots," but the examining doctor found no swelling. (R. 104.) First, it is not clear from the doctor's

notes that she found no swelling. (R. 314.) The doctor merely noted that she wanted to request and review prior medical records regarding Plaintiff's leg swelling. (*Id*.) Moreover, the ALJ found that the Plaintiff had bilateral pitting edema in her legs–a condition that causes swelling. (R. 94.) The ALJ also noted that the Plaintiff used a cane at the hearing that was not prescribed until about two weeks before the hearing. (R. 104.) The ALJ did not state how this fact impacted the credibility analysis, and the use of a cane is generally not grounds on which to question the claimant's credibility. *See Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2011) (noting that a cane does not require a prescription and finding it absurd that "the administrative law judge thought it suspicious that the plaintiff uses a cane"). The ALJ faulted Plaintiff for testifying that she was prescribed amitriptyline for neuropathy even though the medical expert purportedly testified that there is no objective evidence of neuropathy. (R. 104.) But the record does not bear out this account. Dr. Savage testified that he thought the prescription was used both to treat both Plaintiff's neuropathy and depression but that the neuropathy was probably not severe because the doctor had not run any tests normally associated with "significant neuropathy." (R. 61.) While the absence of testing may have been a reason to doubt the severity of Plaintiff's neuropathy, it did not call into question the Plaintiff's credibility regarding whether she was prescribed a drug for neuropathy. Finally, while the ALJ did note that the Plaintiff was not prescribed pain medication until October 2010 (R. 105), the ALJ neglected to consider that the Plaintiff had been undergoing physical therapy for her back pain since 2009.[22] *See* 20 C.F.R. § 404.1529(c)(3)(v) (stating treatments, other than medication,

_____

[22] In challenging the ALJ's assertion that the Plaintiff had not been prescribed pain medication until October 2010, Plaintiff additionally argues that a doctor's note shows that she had taken for ibuprofen in April 2009 (Pl.'s Mem. at 16), but as the Commissioner correctly points out, the ibuprofen was taken to treat a cold, cough, and chills. (R. 296. )

received for relief of pain will be considered).

On the other hand, the ALJ sufficiently supported the assertion that Plaintiff "exaggerat[ed] the extent of pain in her back." (R. 105.) Contrary to the Plaintiff's objection (Pl.'s Mem. at 16), the ALJ did not dismiss Plaintiff's claims of pain solely due to a lack of objective medical evidence, but instead, the ALJ highlighted medical evidence that could suggest symptom exaggeration. (R. 105.) *See Jones,* 623 F.3d at 1161. The ALJ pointed to Dr. Savage's testimony that Plaintiff's MRI and X-rays showed only mild stenosis and "slight narrowing of disk [*sic*] height" in Plaintiff's back, and the ALJ noted that the consultive exam showed a reduced range of motion due to obesity rather than muscoskeletal disease. (R. 105.) The ALJ relied on an April 2010 treatment note that indicated that Plaintiff's back pain had improved and that she was non-compliant with referrals. (*Id*.) Lastly, the ALJ took into account in some of Plaintiff's complaints about pain in the RFC assessment, in that the assessment imposed postural limitations and allowed for a sit/stand option and the use of a cane. (*Id.*)

The ALJ's opinion fares better with regards to Plaintiff's psychiatric symptoms. The ALJ emphasized places in the record that are inconsistent with Plaintiff's statements regarding her concentration problems: her graduate school work, her denial of having problems thinking or concentrating made at a March 2011 therapy session, her therapist's finding that Plaintiff had coherent and lucid thoughts, and her test results showing that her memory, calculations, and general knowledge were adequate. (R. 105.) Plaintiff asserts that the ALJ overlooked other instances in the record that support Plaintiff's claim of concentration issues. Specifically, Plaintiff points to Dr. Stone's observations that Plaintiff had problems maintaining a consistent level of concentration and attention and that Plaintiff cried throughout the examination. (Pl.'s Mem. at 17.) Plaintiff also

highlights various treatment notes that describe an instance where she threw a knife at her daughter's boyfriend, record Plaintiff's statement that she was indifferent and lethargic at times, and generally acknowledge Plaintiff's anxiety. (*Id.*) An ALJ, however, is not obligated to "discuss every piece of evidence in the record and is prohibited only from ignoring an entire line of evidence that supports the finding of disability." *Jones*, 623 F.3d at 1162. Here, the ALJ did discuss both the treatment notes and Dr. Stone's observations in the opinion (R. 97, 102), and none of the ALJ's purported omissions constitute an *entire line* of evidence that would support a finding of disability. Further, the ALJ again took into account Plaintiff's concentration difficulties as Plaintiff's RFC was limited to unskilled production work without strict quotas and mandated reduced interaction with coworkers and the general public. (R. 105.)

All in all, while some aspects of the ALJ's reasoning are flawed, the ALJ supported her credibility finding with sufficient evidence from the record such that the court cannot find the ALJ's finding to be "patently wrong." *See Halsell,* 357 F. Appx. at 722-23 (finding "valid criticisms" in many of Plaintiff's objections, but concluding that overall credibility finding to be "supported by substantial evidence")*; McKinzey*, 641 F.3d at 890 (finding "merit in two out of three" of plaintiff's attacks on ALJ's credibility determination but still upholding ALJ's decision as not "patently wrong"). In summary, the court finds that the ALJ's determination of Plaintiff's RFC is supported by substantial evidence.

## III.  ALJ's Step 5 Conclusion

Plaintiff contends that the ALJ's conclusion at step 5 was not supported by substantial evidence. (Pl.'s Mem. at 17-19.) Specifically, Plaintiff argues that the jobs the ALJ found that

Plaintiff could perform are inconsistent with Plaintiff's RFC.  (*Id.*)

At step 5, the burden is on the government to show that significant number of jobs exist in the national economy which a claimant can perform despite her limitations.  *Weatherbee v. Astrue*, 649 F.3d 565, 569 (7th Cir. 2011).  If a vocational expert is called to testify, the ALJ has the "affirmative responsibility" to ask if the VE's testimony complies the *Dictionary of Occupational Titles* ("DOT") and must resolve any apparent conflicts.  SSR 00-4p, 2000 WL 1898704 at *4.  "A claimant's counsel, on cross examination, has the opportunity to draw the ALJ's attention to any of these conflicts."  *Merritt v. Astrue*, 872 F. Supp. 2d 742, 756 (N.D. Ill. 2012).  Even if a claimant does not raise these inconsistencies at the hearing, a claimant may still argue on appeal that a conflict was "obvious enough that the ALJ should have picked up on [it] without any assistance."  *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008).  Findings that are based on unreliable VE testimony must be vacated.  *Id.* at 464.

The difficulty with this case is at step 5.  The ALJ's analysis up to that step is supported by substantial evidence and consistent with the regulations, or if there is error, the error would be harmless.  The ALJ's step 5 analysis, however is problematic.  Here, based on the VE's testimony, the ALJ found that Plaintiff could perform jobs as a telephone solicitor or an inspector.  (R. 107).  Reviewing the testimony at the hearing in light of the fact that the government has the burden of proof at step 5, the court cannot conclude that there was substantial evidence to support the ALJ's decision.

At the hearing, in response to the ALJ's hypothetical, the VE testified that even with Plaintiff's limitations, including a limitation to unskilled work that does not require the performance of production quotas, Plaintiff could perform the work of a cashier, inspector or information clerk.

(R. 78.) The VE stated that 10,000, 2,000, and 800 of those jobs respectively were available in the metropolitan area. (*Id.*) The result, he said, would be the same with a sit/stand option as well as with use of a cane, as long as the person could stay on task an acceptable amount (that is, 88-90% of the time). (R. 78-79.) In response to the ALJ's question, the VE testified that his opinion was consistent with the DOT. (R. 79.)

On cross-examination, things became less clear. The VE testified that the DOT descriptions did not include a sit/stand option but that the number of available jobs was based on his experience. (R. 80.) Presumably, that means that the VE believed, based on his experience, that there are significant numbers of those jobs available with a sit/stand option. The VE also testified, however, that factors such as a "moderate to marked" degree of difficulty in sustaining ordinary routine without special supervision, in accepting instruction, in getting along with co-workers, or in ability to deal with normal stress, would impinge upon the ability to sustain work activity. (R. 80.) It was not clear, however, whether the VE was agreeing that such considerations would further erode the number of jobs available to this Plaintiff or whether he had considered such limitations in his earlier opinion. At that point Plaintiff's counsel completed his cross-examination and the ALJ adjourned the hearing. (R. 81.)

Perhaps noting that ambiguity, the ALJ resumed the hearing shortly thereafter, and asked the VE if the jobs he cited could be done with "occasional interaction with co-workers and the public." (R 82.) The VE then testified that the cashier and information clerk could not. (R.82.) In response to the ALJ's limitation of "no strict production quotas," the VE testified that he would give jobs at the sedentary level. (*Id.*) He testified that, based on his experience, there are 4,000 telephone solicitor jobs at the sedentary level and 1,000 inspector positions in the metropolitan area at the

sedentary, unskilled level. (R. 82.)  There was no further cross-examination.  (R. 83.)

Plaintiff asserts that the telephone solicitor job requires substantial interaction with the public and has specific vocational preparation and reasoning levels that are inconsistent with "simple, routine work." (Pl.'s Mem. at 18.)  Notwithstanding the VE's testimony that the telephone solicitor job is consistent with "occasional interaction with coworkers and the general public" (R. 82), it is apparent from the DOT description that it is not.[23]

That leaves the  the inspector job, for which the VE testified there are 1,000 such jobs.  One thousand jobs is considered a significant number.  *See Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009).  Plaintiff argues that the specific DOT job description cited by the VE, "final inspector," requires strict production quotas which are inconsistent with Plaintiff's RFC.  (Pl.'s Mem. at 18-19.)  The DOT description of " final inspector" does not include a production quota requirement.[24]  The

---

[23] The DOT job description for "telephone solicitor" is:
Solicits orders for merchandise or services over telephone: Calls prospective customers to explain types of service or merchandise offered.  Quotes prices and tries to persuade customer to buy, using prepared sales talk.  Records names, addresses, purchases, and reactions of prospects solicited.  Refers orders to other workers for filling. Keys data from order card into computer, using keyboard.  May develop list of prospects from city and telephone directories.  May type report on sales activities may contact driver, sales route (retail trade; wholesale tr.) 292.353-010 to arrange delivery of merchandise.

*Dictionary of Occupational Titles* (4th ed. 1991), 299.357-014, 1991 WL 672624.

[24] The DOT job description for "final inspector" is:
Tests polarity connections on finished storage batteries and inspects final assembly for defects: Positions metal prongs of testing unit over terminals of intercell connecting straps and observes bulb on testing unit that lights when cell arrangement is correct. Examines assembly for defects, such as omission of symbols on battery posts, uneven sealing, and cracked covers.

*Dictionary of Occupational Titles* (4th ed. 1991), 727.687-054, 1991 WL 679672.

34

cases appear divided as to whether a production quota is inherent in an inspector job. There is some support for the proposition that an inspector job would have a quota requirement, but there are also cases where the VE has testified that inspector jobs can be performed in a non-quota environment.[25] It is also not clear what distinction was meant by the ALJ's limitation of "without *strict* production quotas" (R. 105, emphasis added), and how that would affect the number of inspector jobs.

In addition to the question about whether the inspector job includes a quota, the VE's identification of 1,000 sedentary inspector jobs does not find support in the DOT. The DOT description for "final inspector" states that the "[p]hysical demand requirements are in excess of those for Sedentary Work." 1991 WL 677672. It is also not clear how the VE's identification of sedentary inspector work was responsive to the question the ALJ posed. The ALJ asked about "[N]o strict production quotas." (R. 82.) The VE responded, "I would then give you jobs at the sedentary level, Your Honor." (*Id.*) The regulation describing the sedentary work level does not, however, have any discussion of pace; rather it discusses physical exertion levels. *See* 20 C.F.R. §

---

[25] *Compare Cheeks v. Comm'r of Soc. Sec.*, 690 F. Supp. 2d 592, 602 n. 9 (E.D. Mich. 2009) ("An exhaustive review of the DOT's many 'inspector' listings indicates that the descriptions of the unskilled positions are either quota based or performed in tandem with production work."); *Travis v. Astrue*, No. 09-cv-0077, 2009 WL 3422770 at *12 (W.D. Wis. Oct. 22, 2009) (" It is worth noting that all of the jobs identified by the vocational expert in response to the administrative law judge's hypothetical—assembly, packaging and inspecting—appear to require a fast pace, high production quotas or both."); *Ramirez v. Barnhart*, 372 F.3d 546, 554 (3d Cir. 2004) ("[T]he vocational expert testified that each of the jobs suitable for [plaintiff] (assembler, packer, and inspector) would have daily production quotas and that [plaintiff] would have to maintain a certain degree of pace to maintain those jobs."), *with Kozlowski v. Comm'r of Soc. Sec.*, No. 11-cv-12213, 2012 WL 3472354 at *5 (E.D. Mich. Mar. 14, 2012) report and recommendation adopted by, 2012 WL 3493036 (E.D. Mich. Aug. 14, 2012) (describing VE's testimony that even with quota restriction, claimant could perform inspector job and noting that "[i]t is not implausible that certain . . . inspector jobs have no pace or quota requirement. And to conclude otherwise would be to question the expertise or credibility of the VE"); *Journell v. Astrue*, No. 1:11–CV–1163, 2012 WL 1605503 at *4 (N.D. Ohio May 8, 2012); *Carrington v. Astrue*, No. 2:07cv967, 2008 WL 4462257 at *3 (W.D. Pa. Sept. 29, 2008).

416.967.  The VE did not explain why a job at a sedentary level could not have a strict production quota.

In light of the questions raised by the VE's testimony and its inconsistency with the DOT and the regulations, the court concludes that the ALJ's finding that the government had carried its burden at step 5 is not supported by substantial evidence.  Accordingly, the case must be remanded to the Commissioner for additional proceedings consistent with this opinion. This is not a finding that Plaintiff is, in fact, entitled to benefits, rather further proceedings are necessary to resolve that question.


## CONCLUSION

For all of the aforementioned reasons, Plaintiff's Motion for Summary Judgment [dkt 20] is granted.  The case is remanded to the Commissioner of Social Security for further proceedings consistent with this opinion.

**IT IS SO ORDERED**.

_____
Geraldine Soat Brown
United States Magistrate Judge

Date: March 7, 2013